David R. Markham (SBN 071814)
dmarkham@markham-law.com
Maggie Realin (SBN 263639)
mrealin@markham-law.com
Lisa Brevard (SBN 323391)
lbrevard@markham-law.com
**THE MARKHAM LAW FIRM**
750 B Street, Suite 1950
San Diego, California 92101
Tel.: (619) 399-3995
Fax: (619) 615-2067

RICHARD E. QUINTILONE II (SBN 200995)
JEFFREY T. GREEN (SBN 330065)
**QUINTILONE & ASSOCIATES**
22974 El Toro Road, Suite 100
Lake Forest, CA 92630
Tel.: (949) 458-9675
Fax: (949) 458-9679
Email: req@quintlaw.com; jtg@quintlaw.com

Attorneys for Plaintiffs Andrea Harrison, Kiarash
Kaffishahsavar and Kimberly Jaco and all others
similarly situated

Stanley D. Saltzman, Esq. (SBN 90058)
Tatiana G. Avakian, Esq. (SBN 298970)
**MARLIN & SALTZMAN, LLP**
29800 Agoura Road, Suite 210
Agoura Hills, California 91301
Telephone: (818) 991-8080
Fax: (818) 991-8081
ssaltzman@marlinsaltzman.com
tavakian@marlinsaltzman.com

*Attorneys for Plaintiff Miguel Mendoza and
the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA HARRISON, an individual, on behalf of herself and all others similarly situated<br>    Plaintiff,<br>  v.<br>BANK OF AMERICA, N.A., a business entity, form unknown; and DOES 1 through 10, inclusive,<br>    Defendants. | **Case Nos.**   **3:19-cv-00316-LB**<br>      **3:19-cv-02491-LB**<br>      **4:20-cv-02119-YGR**<br><br>**CLASS ACTION**<br><br>**[Assigned for all purposes to the Hon. Laurel Beeler, Courtroom B – 15th Floor]** |
| MIGUEL MENDOZA, individually, and on behalf of all others similarly situated<br>    Plaintiff,<br>  v.<br>BANK OF AMERICA CORPORATION, and DOES 1-100, inclusive,<br>    Defendants. | **NOTICE OF UNOPPOSED MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; DECLARATIONS OF COUNSEL IN SUPPORT** |
| KIARASH KAFFISHAHSAVAR, and KIMBERLY JACO on behalf of all others similarly situated<br>    Plaintiffs,<br>  v.<br>BANK OF AMERICA, N.A., a business entity, form unknown,<br>    Defendants. | Date:    May 27, 2021<br>Time:    9:30 a.m.<br>Ctrm:    B – 15th floor<br><br>[NOTICE TO LWDA UPLOADED 4/22/21]<br><br>Complaint filed:   March 25, 2019<br>FAC filed:    June 11, 2019<br>Trial date:    Not set |

**TO:  ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on May 27, 2021, at 9:30 a.m., or as soon thereafter as the matter can be heard in Courtroom B in the above entitled courthouse located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs, on their own behalf, and on behalf of the proposed Class, will move for preliminary approval of a class wide settlement reached with Defendant Bank of America, N.A. ("Defendant").  Defendant does not oppose this Motion.

This Motion shall be based upon this Notice of Motion, the accompanying Memorandum of Points & Authorities filed herewith, the declarations of counsel, the Settlement Agreement entered into by the Parties, and upon such further evidence, both documentary and oral, as may be presented at the hearing of said motion.

Pursuant to the Class Action Settlement Agreement, **Exhibit 1** to the Declaration of Stanley D. Saltzman Esq. ("Saltzman Decl.") and with the supporting information of David R. Markham Esq. ("Markham Decl.") and Richard E. Quintilone II Esq. ("Quintilone Decl."), Plaintiffs hereby request that the Court enter the following Order, following hearing on the motion as noticed above:

(1) Preliminarily approving the proposed settlement, and executing the [Proposed] Order Granting Preliminary Approval of the Class Action Settlement (**Exhibit 2** to the Saltzman Decl.);

(2) Conditionally certifying the proposed Class for settlement purposes, and appointing both class counsel and representative plaintiff status;

(3) Directing that the Class be given notice of the settlement in the form of the proposed Notice agreed to by the parties, **Exhibit B** to the Settlement Agreement, which is **Exhibit 1** to the Saltzman Declaration, for the Court's approval;

(4) Scheduling a hearing to consider final approval of the settlement, entry of a proposed final judgment, finally certifying the Class, and to consider Class Counsels' application for an award of attorneys' fees and reimbursement of costs and expenses, as well as an enhancement award to the Class Representatives.

/ / /

/ / /

/ / /

1

2

DATED: April 22, 2021

**MARLIN & SALTZMAN, LLP**

3

By:___*/s/ Tatiana G. Avakian*_____

4

Stanley D. Saltzman, Esq.

Tatiana G. Avakian, Esq.

5

*Attorneys for Plaintiff Miguel Mendoza and the*

*putative Class*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

CASE NO. 3:19-CV-00316-LB

# **TABLE OF CONTENTS**

I.      NATURE OF RELIEF SOUGHT ....................................................................................1

II.     INTRODUCTION .........................................................................................................2

III.    SUMMARY OF THE LITIGATION ...............................................................................7

    A.   Nature of the Case .............................................................................................7

    B.   Litigation History .............................................................................................7

        1.   The Harrison case .................................................................................. 7

        2.   The Kaffishahsavar case ...................................................................... 8

        3.   The Mendoza case .................................................................... .......... 9

        4.   Mediation .............................................................................................. 9

    C.   Summary of Settlement Terms .........................................................................10

    D.   Settlement Value ..............................................................................................12

    E.   The Settlement has no "Obvious Deficiencies" and Falls within the Approval Range ..............22

    F.   Plaintiffs Face Certification and Liability Risks ..............................................23

IV.     THE SETTLEMENT EXCEEDS THE STANDARDS FOR PRELIMINARY APPROVAL ...........25

V.      NATURE AND METHOD OF CLASS NOTICE.............................................................27

VI.     CLAIMS ADMINISTRATION .....................................................................................28

VII.    ATTORNEYS' FEES AND COSTS ...............................................................................28

VIII.   SERVICE AWARD FOR PLAINTIFFS..........................................................................29

IX.     CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE .........................29

    A.   Federal Rule of Civil Procedure 23(a) Requirements Are Met for the Settlement Class............30

        1.   Numerosity ...........................................................................................30

        2.   Commonality ....................................................................................... 31

        3.   Typicality ............................................................................................. 33

        4.   The Adequacy Requirements Are Satisfied ........................................ 33

    B.   The Federal Rule of Civil Procedure 23(b) Standards Are Satisfied................33

        1.   Common Issues Predominate ..............................................................33

        2.   The Class Action Device Is Superior ................................................. 34

X.      NO MANAGEABILITY ISSUES PRECLUDE CERTIFICATION................................34

XI.     PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS "CLASS COUNSEL" .........34

XII.    CONCLUSION .............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*7-Eleven Owners for Fair Franchising v. Southland Corp.*,
    85 Cal.App.4th 1135 (2000) ...................................................................................22

*Advertising Specialty Nat'l Assoc. v. Fed'l Trade Comm'n.*,
    238 F.2d 108 (1st Cir. 1956) .................................................................................30

*Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc.*,
    2009 WL 2448430 (S.D. Cal. 2009) .....................................................................20

*Amaral v. Cintas Corp. No. 2*,
    163 Cal.App.4th 1157 (2008) ..........................................................................20, 21

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. Cal. 2001) .........................................................................31

*Bellinghausen v. Tractor Supply Co.*,
    303 F.R.D. 611 (N.D. Cal. 2014) ..........................................................................22

*Betancourt v. OS Rest. Servs., LLC*,
    49 Cal. App. 5th 240  (2020) .................................................................................25

*Bravo v. Gale Triangle, Inc.*,
    2017 WL 708766 (C.D. Cal. 2017) .......................................................................20

*Brinker Restaurant Corp. v. Superior Court*,
    53 Cal.4th 1004 (2012) .........................................................................................24

*Carrington v. Starbucks Corp.*,
    30 Cal. App. 5th 504 (2018) .................................................................................21

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ..........................................................................................34

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ..............................................................................22

*Culley v. Lincare, Inc.*,
    236 F.Supp.3d 1184 (E.D. Cal. 2017) ..................................................................21

*Faulkinbury v. Boyd & Associates, Inc.*,
    216 Cal.App.4th 220 (2013) .................................................................................23

Federal Rule of Civil Procedure Rule 23(a)(3) ............................................................33

*Fleming v. Covidien Inc.*,
    2011 WL 7563047 (C.D. Cal. 2011) .....................................................................21

*Franco v. Ruiz Food Products, Inc.*,
    2012 WL 5941801 (E.D. Cal. 2012) .....................................................................20

*Glass v. UBS Financial Services*,
    2007 WL 221862 (N.D. Cal. 2007) ........................................................................22

*Grant v. Capital Mgmt. Servs., L.P.*,
    2013 WL 6499698 (S.D. Cal. 2013) .......................................................................35

*Hammit v. Lumber Liquidators*,
    19 F. Supp. 3d 989 (S.D. Cal. 2014) ......................................................................24

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..................................................................25, 27, 34

*In re Heritage Bond Litig.*,
    2005 WL 1594403 (C.D. Cal. 2005) ......................................................................25

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ...........................................................................22, 25

*In re Skilled Healthcare Grp., Inc. Sec. Litig.*,
    2011 WL 280991 (C.D. Cal. 2011) ........................................................................27

*In re Surebeam Corp. Secs. Litig.*,
    2004 WL 5159061 (S.D. Cal. 2004) .......................................................................33

*Laffitte v. Robert Half International Inc.*,
    1 Cal.5th 480 (2016) ..............................................................................................28

*Lazarin v. Pro Unlimited, Inc.*,
    2013 WL 3541217 (N.D. Cal. 2013) ......................................................................34

*Leyva v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ..................................................................................34

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ................................................................................23

*Maldonado v. Epsilon Plastics, Inc.*,
    22 Cal.App.5th 1308 (2018) ...................................................................................24

*Mendez v. Tween Brands, Inc.*,
    2010 WL 2650571 (E.D. Cal. 2010) ......................................................................22

*Naranjo v. Spectrum*,
    40 Cal.App.5th 444 (2019) .....................................................................................24

*Nichols v. Smithkline Beecham Corp.*,
    2005 WL 950616 (E.D. Pa. 2005) ..........................................................................22

*Ochoa-Hernandez v. CJADERS Foods, Inc.*,
    2010 WL 1340777 (N.D. Cal. 2010) ......................................................................22

*Officers for Justice v. Civil Service Com'n of City and County of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ..................................................................................22

*Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ...................................................................................25

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. Cal. 2010) ............................................................................33

*Ruch v. AM Retail Grp., Inc.*,
   2016 WL 5462451 (N.D. Cal. 2016)...........................................................................21

*Sandoval v. Tharaldson Employee Management, Inc.*,
   2010 WL 2486346 (C.D. Cal. 2010) ...........................................................................25

*Schiller v. David's Bridal, Inc.*,
   2012 WL 2117001 (E.D. Cal. 2012) ............................................................................20

*Slavkov v. Fast Water Heater Partners I, LP*,
   2017 WL 3834873 (N.D. Cal. 2017)............................................................................22

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ......................................................................................27

*Trang v. Turbine Engine Components Technologies Corp.*,
   2012 WL 6618854 (C.D. Cal. 2012) ...........................................................................20

*Troester v. Starbucks Corp.*,
   5 Cal. 5th 829 (2018) ..................................................................................................23

*True v. Am. Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) .......................................................................25

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010) ......................................................................................30

*Van Kempen v. Matheson Tri-Gas, Inc.*,
   2017 WL 3670787 (N.D. Cal. 2017)............................................................................21

*Vasquez v. Coast Valley Roofing, Inc.*,
   266 F.R.D. 482 (E.D. Cal. 2010) ................................................................................28

*Villacres v. ABM Indus. Inc.*,
   189 Cal. App. 4th 562 (2010) .....................................................................................20

*Villegas v. J.P Morgan Chase & Co.*,
   2012 WL 5878390 (N.D. Cal. 2012)............................................................................22

*Williams v. Superior Court*,
   221 Cal.App.4th 1353 (2013) .....................................................................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

Labor Code § 226 ..................................................................................................passim

Labor Code § 558 ................................................................................................20, 21

Labor Code § 2699(h).................................................................................................21

**Rules**

Federal Rule of Civil Procedure 23(a)....................................................................30, 33

Federal Rule of Civil Procedure 23(a)(1) ....................................................................30

Federal Rule of Civil Procedure 23(a)(2) ....................................................................31

Federal Rule of Civil Procedure 23(a)(4) ....................................................................33

Federal Rule of Civil Procedure 23(b)............................................................27, 30, 33

Federal Rule of Civil Procedure 23(b)(3) ..........................................27, 30, 33, 34

Federal Rule of Civil Procedure  23(c)(2)(B) ..............................................................27

Federal Rule of Civil Procedure 23(g).........................................................................34

**Other Authorities**

*Manual of Complex Litigation*, 4th, § 21.632 (2004) ................................................25

Newberg & Conte, *Newberg On Class Actions* § 11.41 (3d ed. 1992)..............................26

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 3:19-CV-00316-LB

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    NATURE OF RELIEF SOUGHT

By this unopposed motion, Plaintiffs and the Classes set forth below, seek preliminary approval, and conditional certification for settlement purposes, of a substantial, <u>non-reversionary</u>, settlement of all claims asserted in the proposed consolidated complaint, filed contemporaneously herewith.  After many months of negotiations, beginning on **July 23, 2020,** and continually under the guidance of well-respected mediator David Rotman, Esq., the Parties finally reached this proposed class-wide settlement, which was then executed by the Parties on December 31, 2020.

The proposed settlement is intended to resolve all of the claims alleged in the cases of *Harrison v. Bank of America* (Case No. 3:19-cv-00316-LB) and *Kaffishahsavar v. Bank of America* (Case No. 4:20-cv-02119-YGR).  It is also intended to resolve those claims alleged in the matter of *Mendoza v. Bank of America* (Case No. 3:19-cv-02491-LB), that do not overlap with the limited claims previously and conditionally certified by this Court in the matters of *Frausto v. Bank of America, National Association*, Case No. 3:18-cv-01983-LB, and *Suarez v. Bank of America Corporation*, Case No. 3:18-cv-01202-LB.[1] This will of course be discussed in more detail hereafter.  But suffice to say at this time that the settling Parties have agreed that the claims conditionally certified by this Court, in said matter, at Docket No. 128 of Case No. 3:18-cv-01983-LB, and as clarified in Docket No. 156 of said Case, are being carved out of this settlement, notwithstanding Defendant's forthcoming motion for reconsideration of the certification order.  *See* Docket Nos. 157, 158 of Case No. 3:18-cv-01983-LB.

As noted in footnote 1 below, there were a lot of moving parts on the day of the mediation, and it required extremely hard work by the settling Parties and mediator David Rotman to eventually reach the excellent settlement presented here for approval.  The proposed Class Definition, setting forth those on whose behalf this settlement relief is sought, is set forth in the contemporaneously filed proposed

---

[1] Counsel for various other cases pending against Bank of America were also invited to, and were present for, the mediation on July 23, 2020.  The *Frausto* and *Suarez* counsel's involvement in the mediation ended by about mid-day.  Counsel for an unrelated "call center" case (also known as "contact centers") were present throughout, and also received a mediator's proposal.  That matter, along with a second "call center" case, have recently settled, and that settlement does not overlap with the claims in the *Frausto* and *Suarez* matters.  Markham Decl. ¶ 2.

Consolidated Complaint, as follows:

1.     The Class consists of Defendant's current and former non-exempt employees that fall within at least one of the following subclasses:

a.     Employees working or who worked in the State of California for Defendant as a "Teller" (meaning Job Codes RT600 – FC Client Service Rep and RT601 – Market Client Service Repo) on or after October 26, 2014, through the date of preliminary approval of the settlement by the Court (the "Harrison Class"); and/or

b.     Employees working or who worked in the State of California for Defendant as a "Financial Center Operations Manager" or a "Financial Center Assistant Manager" (meaning Job Codes RM019 – Assistant Manager-FCC and RM038 – Financial Center Assistant Manager) on or after March 25, 2015, through the date of preliminary approval of the settlement by the Court (the "Mendoza Class"); and/or

c.     Employees working or who worked in the State of California for Defendant as a Personal Banker (Job Code RS600), Senior Personal Banker (Job Code RS601), Relationship Manager (Job Code BQ055), Relationship Manager and Lending Specialist (Job Code BQ22), Sales and Service Specialist (Job Code RS860), Relationship Banker (Job Code RS861), or a Relationship Banker – Hybrid (Job Code RS862) on or after March 27, 2016, through the date of preliminary approval of the settlement by the Court (the "Kaffishahsavar Class").

The Class expressly excludes therefrom any individuals who, as of the date of final approval of the Class Settlement, have filed a pending, separate lawsuit, individually and/or as a putative class or representative action, asserting the same claims to those alleged in the Lawsuits, including but not limited to the certified claims in *Frausto v. Bank of America, N.A.*, Case No. 3:18-cv-01983-LB and *Suarez v. Bank of America, N.A.*, Case No. 3:18-cv-01202-LB, as set forth in Dkt. #128 of Case No. 3:18-cv-01983-LB. The Class also excludes any former employee of Defendant who has previously released such claims. With respect to any current employee who has previously released such claims, any time period covered by each such employee's release agreement shall be excluded from the calculation of any settlement sum payable under this Agreement.

## II.   INTRODUCTION

After several years of collective ongoing litigation in the three previously separate cases now joined together in this settlement, the Parties have now reached a proposed settlement for the total amount of **$11,500,000.00,** without any right of reversion. By any measure, this is a substantial settlement of heavily disputed claims. The details of the settlement are set forth in the Class Action Settlement Agreement, **Exhibit 1** to the Saltzman Decl. (Saltzman Decl. Ex. 1). A brief summary of each of the three

cases is outlined below:

The **Harrison case**, filed on **October 26, 2018**, sought relief for various wage and hour violations alleged on behalf of the Plaintiff and a proposed class of the Bank's Tellers, from and after October 26, 2014, through the date of preliminary approval of a settlement by the Court.  Plaintiff Harrison alleged in sum and substance that she and the other non-exempt, hourly paid Tellers, were routinely required to arrive early to their shifts to perform both opening procedure and workstation set-up tasks, including booting-up her computer and essential programs.  She further alleged that at the end of the day, the Tellers were required to complete similar post-shift tasks off-the-clock after the end of her scheduled shift time, including assisting their managers with balancing and vault procedures, and closing her programs and workstation. Plaintiff testified that she would typically spend 15 to 20 minutes, or more, off-the-clock, both before and after her shift on these required pre- and post-shift tasks.

Plaintiff Harrison further alleged that she and the other Tellers meal and rest breaks were routinely interrupted by their managers because of a need to assist customers waiting in queue at the teller lines. Plaintiff alleges to have been instructed by her manager to record a meal break in her timesheet whether she was able to take it or not, and further alleged that the same was true for the other members of this Teller class. Plaintiff did not recall receiving a premium payment for these interrupted meal or rest breaks.

The **Kaffishahsavar case**, filed on **March 27, 2020,** sought relief for various wage and hour violations alleged on behalf of the Plaintiff and a proposed class of the Bank's Personal Bankers, from and after March 27, 2016, through the date of preliminary approval of a settlement by the Court. The proposed class of Personal Bankers was defined to include all Bank of America employees working or who had worked in the State of California for Defendant as a Personal Banker, Senior Personal Banker, Relationship Manager, Relationship Manager and Lending Specialist, Sales and Service Specialist, Relationship Banker, or a Relationship Banker – Hybrid on or after March 27, 2016.  The two proposed class representatives of this class are Plaintiff Kiarash Kaffishahsavar and Plaintiff Kimberly Jaco.

Plaintiffs alleged that they were routinely required to arrive early to their shifts to perform both opening procedure and workstation set-up tasks, including booting-up their computers and programs essential to perform their job duties. Plaintiffs alleged it would often take them and the class members up to 30 minutes to complete the pre-shift opening procedures and boot-up their workstations, but Plaintiffs and other employees were not permitted to clock-in until the start of their shifts.

Plaintiffs alleged that they experienced similar post-shift tasks that they were required to perform after the end of their scheduled shift time. Plaintiffs would spend several minutes shutting down the required programs and their computers after they had clocked-out at the end of their scheduled shift. Further, Plaintiffs alleged that they and other class members were required to keep working after the end of their shifts, off-the-clock, to complete tasks required by their managers such as completing compliance questions and performing audits.

Plaintiffs further alleged that they and other class members were at times required to work through or take delayed meal and rest breaks due to the press of business. Plaintiffs alleged it was common for class members to receive customer calls during meal breaks both in the bank and on their personal cell phones. Plaintiffs do not recall receiving premium payments for these alleged interrupted meal and/or rest periods.

Finally, Plaintiffs alleged that when they and other class members would receive calls from customers on their personal cell phones, Defendant failed to reimburse these necessarily incurred costs. Plaintiffs alleged they would receive calls both during and outside of business hours and management was aware that these calls were occurring on employees' personal cell phones.

The **Mendoza case**, filed on **March 25, 2019**, sought relief for various wage and hour violations alleged on behalf of the Plaintiff and a proposed class of the Bank's non-exempt California operations managers (also sometimes referred to as Assistant Managers).  Saltzman Decl., ¶ 3.  Plaintiff Mendoza alleged that he and the other Operations Managers worked shifts over five hours in length beginning March 25, 2015 and up through the date of preliminary approval, and that while doing so, they (1) were not provided with off duty, uninterrupted, 30 minute meal breaks that started before the beginning of their sixth hour of work; (2) were not provided off duty rest periods of at least 10 minutes for every 4 hours of work or major fraction thereof; and (3) were not reimbursed for the use of their personal cell phones for work-related reasons.

More specifically, Plaintiff Mendoza alleged that he and other Operations Managers were not provided with compliant meal and rest periods because Defendant instructed them to remain on the premises during their meal and rest breaks to perform their work duties, including, but not limited to: assisting bankers and tellers with customer transactions (i.e., reviewing and approving transactions that required managerial approval (i.e., where the amount or type of transactions exceeded the bankers' or tellers' approval limits), having the keys and/or combinations to access the vault in order to retrieve reserved cash, responding to customer inquiries; performing dual control functions with lower-level employees [i.e., high-level employees, such as Operations Managers, and

low-level employees would need to access the bank vault, together, in order to retrieve cashiers' checks or foreign currency]).

Plaintiff Mendoza alleged that as a result of being instructed to remain on the premises, his meal and rest breaks and those of other Operations Managers were automatically interrupted. Thus, it is alleged that the Operations Managers were improperly required to essentially take on-duty meal periods, even though no on-duty meal period agreements were executed and the nature of the work did not necessitate on-duty meal periods.

In addition, Plaintiff Mendoza alleged that Defendant's understaffing policies resulted in Operations Managers being required to remain on the premises to perform work. He alleged that, had a second Operations Manager been on-site, one could always leave the branch for a proper off-duty meal and/or rest break.

Moreover, it is alleged that as a result of not being provided duty-free meal periods, Plaintiff Mendoza and other Operations Managers worked off-the-clock during their lunch breaks, and were not compensated for that time, at the appropriate regular rates and/or overtime rates of pay.

Further, Plaintiff Mendoza alleged that he and other Operations Managers were required to keep their personal cell phones on their person, in order for his supervisors to contact him about work-related matters.

While the three above-listed cases were moving through their various stages of law and motion, and discovery, discussed further herein, the subject of possible resolution was also discussed by the Parties.  All the Parties recognized, as is true in most class actions, that while endless litigation is sometimes viewed as the "inevitable" course of class action suits, it is not necessarily the best course of action.  To the contrary, if reasonable counsel on both sides are capable of addressing resolution sooner rather than later, it is likely that all Parties and all the class members can be better served.  Here, the fact that several of the class counsel herein have taken certified class action cases to trial, at least five times, is an underlying fact that helps to drive resolution by other means.  Saltzman Decl., ¶ 32.  Thus, while the litigation was taking its "normal" course, counsel for all the Parties also kept an open mind to mediation as a possible alternative course. Eventually, the Parties agreed to attempt to seek resolution through mediation, and selected one of the premier mediators in the State, if not the country, David Rotman, Esq., of Rotman Mediated Negotiations, in San Francisco.

As is commonly required in anticipation of mediation, Defendant agreed to provide further data points to Counsel in each of the three actions joined together for the mediation, so that all counsel on both sides had more than sufficient information available to them to properly evaluate their respective cases, and the claims

1    asserted, and thus satisfy their obligations to the class members.  Saltzman Decl., ¶ 8.

2        As has been common in this Age of Covid, the mediation with Mr. Rotman took place via Zoom,

3    on July 23, 2020.  Saltzman Decl., ¶ 9.  The mediation lasted from early in the morning until well past

4    9:00 pm, for a total of over 12.5 hours of negotiations.  *Id.*  While settlements were not reached that day,

5    sufficient progress was made such that the mediator indicated that he would follow up with a "mediator's

6    proposal".  *Id.*  On July 24, 2020, Mr. Rotman in fact transmitted a written proposal to settle the cases,

7    and afforded the Parties three weeks, until August 14, 2020, to respond to him privately as to whether they

8    would accept or reject his settlement proposal.  *Id.*, ¶ 10.

9        Ultimately, after two extensions on the deadline to respond were granted to consider the proposal,

10   the Parties in these three banking center cases herein did reach an agreement to accept the mediator's

11   proposal.  Saltzman Decl., ¶ 10.  The Parties then began the laborious process of negotiating and reaching

12   agreement on a long form settlement agreement documenting the agreement.  *Id.*  The Settlement

13   Agreement was fully executed on December 31, 2020, and is respectfully presented to this Court.  Notably,

14   it requires a **non-reversionary** gross settlement payment in the total amount of **$11,500,000.00**.

15   (Saltzman Decl. Ex. 1, ¶ 20). The settling Class Members **will not be required to complete and submit**

16   **any claim forms in order to receive their share of the settlement proceeds.** *Id.*, ¶ 30.  All participating

17   class members (i.e. those who do not elect to opt out of the settlement), will have a settlement check

18   mailed to them once the settlement receives final approval from this Court, as will be sought by the Parties.

19       The Parties have agreed on the form of the Notice of Class Action Settlement, to be mailed via

20   first class mail to all the Class Members to inform them of the terms of the Settlement. The proposed

21   Notice of Class Action Settlement is attached as Exhibit B to the Class Action Settlement Agreement,

22   attached as Exhibit 1 to the Saltzman Decl. (Saltzman Decl. Ex. 1 [Ex. B]). Following a process of

23   receiving multiple bids for the settlement administrative procedures, the Parties have agreed to the

24   designation of Simpluris, Inc. as the Settlement Administrator, to perform the usual and necessary services

25   required of a Settlement Administrator.  Saltzman Decl., ¶¶ 24-25; Markham Decl., ¶50.

26       As more fully explained below, the parties believe that the proposed settlement meets the criteria

27   for preliminary approval which are set forth in the Manual for Complex Litigation, 4th Ed., and that it is

28   well within the range of what would be fair, reasonable, and adequate in this case.  Thus, Plaintiffs request

that preliminary approval of the settlement be granted.

## III.   SUMMARY OF THE LITIGATION

### A.   Nature of the Case

Plaintiffs and the members of the proposed settlement Class are or were employed by the Bank in various positions within the many Bank of America locations throughout the State of California, known as Bank of America's "banking centers" or "financial centers".  As described above, the various positions included the Tellers, the Personal Bankers and the Operations Managers (also sometimes referred to Assistant Managers).  All of the class members were and still are classified as non-exempt hourly employees, entitled to all the rights and benefits of employment in this State.  Thus, the cases were focused on whether or not the Bank met its various wage and hour obligations to the employees involved in the three banking center cases.

The three separate actions are now the subject of a proposed consolidated complaint filed herewith, for purposes of facilitating the settlement before the Court.  The case litigation histories are briefly summarized below.

### B.   Litigation History

#### 1.   The Harrison case

After filing her Complaint against Bank of America on October 26, 2018, in San Francisco Superior Court, Plaintiff Harrison then filed her First Amended Complaint on December 24, 2018, to include her allegations of violations under the California Labor Code Private Attorney General Act ("PAGA").  Defendant answered the First Amended Complaint on January 17, 2019, and on January 18, 2019 Defendant removed the case to the Northern District of California, where it was assigned case no. 3:19-cv-00316, and assigned to this Court. Quintilone Decl. ¶ 5.

The Parties have engaged in both formal and informal discovery. In May and August 2019, Plaintiff served discovery requests on Defendant for production of documents and interrogatory responses. Plaintiff also responded to Defendant's requests for production of documents and interrogatory responses in July 2019. On August 13, 2019, Plaintiff served a 30(b)(6) deposition notice. The Parties then engaged in meet and confer discussions regarding class discovery. On October 3, 2019, Defendant took Plaintiff Andrea Harrison's

deposition. A *Belaire* notice was sent to an agreed upon sample of 580 putative class members on November 7, 2019. Quintilone Decl. ¶ 6.

Through formal discovery, Defendant produced documents including Plaintiff's personnel file and timecard report, Defendant's policies and training documents, Plaintiff's payroll records, and a sample of Plaintiff's *Merlin* data. Defendant has also produced a sampling of vault access logs from the Auburn Financial Center location where Plaintiff worked. In advance of the mediation session, on March 3, 2020, Defendant provided a sample of class member data for approximately 5% of class members, including timekeeping and payroll data. Plaintiff engaged an expert to conduct a comprehensive damages analysis prior to mediation. Quintilone Decl. ¶ 7.

The Parties also engaged in motion practice. On October 25, 2019, Defendant filed a partial motion for summary judgment as to Plaintiff's claims under <u>Labor Code</u> §§ 203, 226 (to the extent violations were predicated on meal and rest break premiums) and the UCL. Plaintiff filed her opposition to Defendant's motion on November 8, 2019. The Parties then agreed that they would delay hearing on the motion until after mediation (in the event the case was not resolved and Defendant wished to re-notice the motion). Quintilone Decl. ¶ 8.

### 2.        The Kaffishahsavar case

Plaintiff Kaffishahsavar, on behalf of himself and others similarly situated, filed his Complaint against Bank of America on March 27, 2020, in the Northern California District Court. On April 20, 2020, Plaintiff filed an administrative motion to relate the case with the *Harrison v. Bank of America* case also pending in the Northern District. Defendant opposed Plaintiff's motion, and on May 31, 2020, the Harrison court entered an order deeming the cases not related, on the basis that Harrison is brought on behalf of Tellers, and Kaffishahsavar on behalf of Personal Bankers.  Markham Decl., ¶11.

On April 28, 2020, Defendant filed a Motion to Dismiss Plaintiff's Complaint. On May 12, 2020, Plaintiffs filed a First Amended Complaint asserting additional factual allegations, and also added Plaintiff Jaco as a named plaintiff, mooting Defendant's motion to dismiss. On May 14, 2020, the Parties entered into a joint stipulation to stay case deadlines, including Defendant's deadline to respond to Plaintiffs' Amended Complaint, until after the mediation session.  Markham Decl., ¶12.

The Parties engaged in informal discovery in advance of the mediation session. Plaintiffs' counsel reviewed operative policies, training manuals and handbooks, and in July 2020, Defendant provided a class

member data sample, including timekeeping, payroll data and login/logout data from Defendant's Aternity program (recording computer login/logouts). Plaintiff engaged an expert to analyze the data and prepare a comprehensive damages analysis prior to the mediation session. Markham Decl., ¶17.

### 3.   The Mendoza case

Plaintiff Mendoza, on behalf of himself and others similarly situated, filed his Complaint against Bank of America on March 25, 2019, in the Superior Court of Contra Costa County, California, which Bank of America removed to the United States District Court for the Northern District of California on May 8, 2019.  Saltzman Decl., ¶ 3.

On May 15, 2019, Defendant filed a Motion to Dismiss and/or Strike Plaintiff's Complaint. On June 10, 2019, Plaintiff filed a First Amended Complaint asserting additional factual allegations. Saltzman Decl., ¶ 4.  On July 25, 2019, Defendant filed a motion to dismiss and/or strike Plaintiff's First Amended Complaint, which the Parties briefed and the Court issued an Order on August 30, 2019, granting in part and denying in part Defendant's Motion to Dismiss and/or Strike. *Id.*, ¶ 5.  On October 21, 2019, Plaintiff filed a Second Amended Complaint, asserting additional factual allegations. *Id.*, ¶ 6.  Defendant filed its Answer to the Second Amended Complaint on November 4, 2019.  *Id.*

The Parties propounded formal written discovery, but agreed to stay the action (including, the deadline to respond to the formal discovery), pending the Parties' July 23, 2020 mediation. Saltzman Decl., ¶ 7.  In preparation of mediation, Defendant provided Plaintiff with class member data, including the class size, hourly rates for the class members, Bank of America financial centers where the class members worked, their dates of employment, payroll data, timekeeping data, login/logout data from Defendant's Aternity program (recording computer login/logouts), and other relevant data points, including the total number of workdays, workweeks, pay periods, and the total amount paid in meal period premium payments. *Id.*, ¶ 8.  Plaintiff analyzed the data and prepared a comprehensive damages analysis prior to the mediation session. *Id.*

### 4.   Mediation

Lead counsel for the proposed classes in all three cases and defense counsel expended substantial time prior to the mediation, working together in a constructive manner to clarify the accuracy, depth and the overall impact of the information and additional data provided under the mediation privilege.  Saltzman Decl., ¶ 9.  In fact, in the months leading up to the mediation, lead counsel were in regular contact over

the many details of the cases which would be "in play" at the mediation.  *Id*.  This extensive, and cooperative, exchange of information was a critical factor in enabling the settling parties herein to make so much progress during the extended Zoom mediation on July 23, 2020, even though an actual resolution was not achieved that day.  *Id*.  There were, simply stated, numerous moving parts in the various Zoom rooms throughout the day, and it was very difficult at times to understand whether meaningful progress was in fact being made.  *Id*.  Yet, somehow, by about 9:30 pm when the mediation was coming to a close, Mr. Rotman advised everyone still involved at that time that he felt he was in a position to issue various "mediator's proposals" on the several cases before him, that he felt had a chance of being accepted. *Id*.

As noted above, Mr. Rotman issued a proposal on July 24, 2020 to settle these three banking center cases before this Court at this time.  Saltzman Decl., ¶ 10.  So, not only did settlement discussions involve Defendant, but Plaintiffs' counsel also needed to talk between themselves to see if they could come to a mutual decision as to whether or not to accept the proposal directed at their three cases, and settle them on a collective basis.  *Id*.  Plaintiffs' counsel and their representative clients, in the interests of all three proposed class actions, did in fact negotiate in good faith as between themselves, in order to reach a pathway forward to settlement, if the Bank ultimately decided to accept the banking center mediator's proposal.  *Id*.  After several extensions on the deadline to accept or reject the proposal as to the three banking center cases, a commitment was agreed upon in mid-September 2020, which eventually was documented and signed on December 31, 2020, for a complete settlement of the claims in the three cases. *Id*.

### C.   Summary of Settlement Terms

The terms of the settlement are set forth in the Settlement Agreement attached to the Saltzman Decl. as Exhibit 1 thereto and incorporated herein by reference. (Saltzman Decl. Ex. 1, ¶ 20). The principal terms are:

a.   Defendant shall pay **Eleven Million, Five Hundred Thousand Dollars ($11,500,000)**. This sum includes payments to be made to Class members, all employer and employee payroll taxes, settlement administration costs, awards of attorneys' fees and costs/expenses, incentive awards to the named Plaintiffs and a payment to the LWDA under the PAGA claims.  *Id*., ¶ 21.

b.      The allocation of the funds as between the settling class members in the three cases being settled is structured so as to recognize the agreed strengths of the cases, and the differing hourly pay levels, so that the allocation formula reasonably reflects the valuations of the claims of the various class members.  *Id.*, ¶ 32.

c.      After deduction for all approved payments for settlement administration costs, all payroll taxes, awards of attorneys' fees and costs, incentive awards to the named plaintiffs and the PAGA payment, the remaining amount available for the settlement payments to the class members represents the Net Settlement Amount available for distribution to the class members.  No funds will revert to or be returned to the Defendant.  *Id.*, ¶¶ 20, 22.

d.      Counsel for the Class shall apply to the Court for an award of fees and costs.  Said fee includes all of the work remaining to be performed in documenting the Settlement, securing Court approval of the Settlement, making sure that the Settlement is fairly administered, and obtaining dismissal of the action.  Defendant will not object to a fee request by Plaintiffs' counsel in an amount not to exceed a combined total of 30% of the Settlement fund (or, **$3,450,000**), nor will Defendant object to a request by Class Counsel for reimbursement of reasonable costs and expenses in a combined amount not to exceed **$100,000.00**, as determined by the Court.  *Id.*, ¶ 26.

e.      Each Plaintiff will seek an enhancement award of $10,000.00 and Defendants will not object to an enhancement award in that amount.  *Id.*, ¶ 27.

f.      Each Class Member will be entitled to receive a portion of the amount of the Net Settlement Amount, which shall be allocated as follows:

Each Settlement Class Member's share of the NSF shall be calculated by multiplying the NSF by a fraction, the numerator of which is the total number of credited workweeks the Participating Class Member worked for Defendant in California during the applicable time period as a member of one or more of the Classes and the denominator of which is the total number of credited workweeks all of the Settlement Class Members worked for Defendant in California during

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 3:19-CV-00316-LB

the applicable class period as members of the Classes. Each Settlement Class Members' actual workweeks worked for Defendant in California during the applicable time period as a member of one or more of the Classes (the "Base Workweeks") shall be calculated by Defendant from its records and be reflected on the Class List (as defined in the Settlement Agreement). Each Settlement Class Member's credited workweeks shall be calculated by the Settlement Administrator by multiplying their Base Workweeks by the following factors:

      a.     Harrison Class Base Workweeks: 1.00;

      b.     Mendoza Class Base Workweeks: 1.66; and

      c.     Kaffishahsavar Class Base Workweeks: 1.27. *Id.*, ¶ 32.

g.     "Workweeks" for all allocation purposes shall be calculated from Defendant's records, with Settlement Class Members given credit for each week they worked during the class period, as reflected in Defendant's records. Settlement Class Members will be entitled to offer documentary evidence to contest their allocation of workweeks, should they feel it is not correct. *Id.*, ¶¶ 32, 35.

h.     The parties have selected **Simpluris**, as the Settlement Administrator. *Id.*, ¶ 29.

i.     The Parties have agreed on the language of a proposed Notice of Class Action Settlement to be disseminated via first class mail to all potential class members identified in Defendant's records, a copy of which is to the Settlement Agreement as Exhibit B thereto. (Saltzman Decl. Ex. 1,[Ex. B]).

j.     The Notice will be mailed by first class mail. *Id.*, ¶ 42.

k.     Class Members will have forty-five (45) days from the date the Notice is mailed to postmark any objections to the settlement, or to opt out of the class. *Id.*, ¶¶ 33-34.

l.     Class Counsel shall file their motion for approval of fees, costs and incentive, as directed by the Court in its order granting preliminary approval.

**D.**     <u>Settlement Value</u>

This settlement, as is true of all settlements, represents a compromise between the two sides to this controversy. Clearly, there were significant disagreements between the Parties as to the facts, the law, the

likelihood of obtaining and retaining certification through trial, and the application of all these factors to Defendant's banking center employees.

In light of the information available to the Parties, and the analysis thereof by the extremely experienced and well qualified counsel representing the class before this Court, and the utilization of experts in relation to the evaluation of the extensive records and data both discovered and provided in anticipation of the mediation, both sides (and certainly the moving plaintiffs herein) were able to quantify the claims presented.  In doing so, they weighed the relative strengths and weaknesses of the cases, and then considered all that information when negotiating the fair and just resolution being presented to this Court.  In that regard, the following information is most pertinent to the analysis performed:

The Settlement Amount of **$11,500,000** derives primarily from Plaintiffs' alleged claims for unpaid time, including time worked pre- and post-shift and during meal periods, and Plaintiffs' meal and rest break claims. Pre-mediation exchange of data indicated there are a total of 1,900,000 workweeks during the class period (approximately 140,000 workweeks for assistant managers, 925,314 workweeks for tellers and 834,686 workweeks for the banker positions).  Markham Decl., ¶19.  The class members' hourly rates in these positions ranged from $15.68 to $26.16, for a weighted blended hourly rate of $18.35. *Id.*  The analysis of this data, and Plaintiffs' investigation of the claims in this action, reveals Bank of America's maximum realistic potential exposure is as follows:

Unpaid Time:

**Harrison Case (Unpaid Regular and Overtime Wages):** Plaintiff Harrison alleges that she and other similarly situated class members worked on average 15 to 30 minutes off-the-clock every day to perform pre- and/or post-shift tasks as required by Defendant, including when required to complete opening and/or closing procedures, and when required to assist customers and perform necessary tasks while clocked-out for a meal period. Plaintiff analyzed Harrison's teller activity records from the *Merlin* program (recording teller transactions), which indicated few instances of activity in *Merlin* occurring before the shift clock-in time. Approximately 25% of Plaintiff Harrison's shifts indicated a *Merlin* transaction during a clocked-out meal period. Based on the data analyzed and investigation of the claims, Plaintiff Harrison calculates the maximum realistic potential exposure for Plaintiff's unpaid time claim as follows: 925,314 workweeks x 1 hour unpaid wages (approximately 15 minutes per shift, tellers worked an average of 4 shifts per workweek) x $15.68 average

hourly rate ($23.52 overtime rate)[2] = $17,410,708  Further, in light of the risks to certification and establishing liability, as outlined more fully in section F below, Plaintiffs discount this claim by 50% to a maximum realistic potential liability of $8,705,354. Markham Decl., ¶20.

**Kaffishahsavar Case (Unpaid Wages for Overtime and Regular Wages):** Plaintiffs Kaffishahsavar and Jaco allege that they and other similarly situated class members worked on average 15 to 30 minutes off-the-clock every day to perform pre- and/or post-shift tasks as required by Defendant, including when required to complete opening procedures, audit reports, and when required to assist customers and perform necessary tasks while clocked-out for a meal period. Plaintiffs engaged an expert to analyze a sampling of Aternity activity data (login/out data from program used by bankers and managers) and to compare this login/out data with a sampling of time records. This analysis indicated that only approximately 4% of bankers had activity occurring in Aternity before they had clocked-in, by an average of 7 minutes, and 45% of bankers showed activity in Aternity after clocking-out, with an average of 2 minutes of activity after clock-out. *Id.*, ¶21.

Based on the data analyzed and investigation of the claims, Plaintiffs calculate the maximum realistic potential exposure for Plaintiffs' unpaid time claim as follows: 834,686 workweeks x 1.25 hour unpaid wages (approximately 15 minutes per shift; bankers worked an average of 5 shifts per workweek) x $30.53 blended average hourly overtime rate between banker positions = $31,853,704  Further, in light of the risks to certification and establishing liability, as outlined more fully in section F below, Plaintiffs discount this claim by 50% to a maximum realistic potential liability of $15,926,852.  *Id.*

**Mendoza Case (Unpaid Wages for Overtime and Regular Wages):** These claims were primarily based upon Plaintiff's contention that Operations Managers did not receive duty-free meal periods because they worked during their meal periods (as set forth in more detail below, under the "Meal Breaks" section), and therefore, were not paid at the regular and overtime rates for working during their meal periods. For valuation purposes, Plaintiff estimated violations for approximately 700 current full time employees ("FTEs") assigned to work at any given time for Defendant[3]. Plaintiff estimated the total value of these claims as

---

[2] Expert analysis indicated that 60% of teller shifts were under 8 hours and thus additional time worked off-the-clock would be paid at a regular rate; whereas 40% of teller shifts were over 8 hours and thus off-the-clock work would be owed at an overtime rate. The damages analysis reflects these allocations.

[3] Based on an extensive review of the records and data produced by Defendant in the case, Plaintiff Mendoza estimates that there have been approximately 700 class member Operations Managers

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE No. 3:19-CV-00316-LB

equaling $2,732,506.81, based on an assumption of two and a half hours of unpaid overtime per week. Saltzman Decl., ¶ 16.  This claim is tethered to the failure to provide duty-free meal periods (which is further described below). Based on Defendant's policies, practices, and procedures of requiring Plaintiff and other Operations Managers to remain on the premises during their meal breaks (and thus, forcing them to take on-duty meal periods, when the job did not necessitate such meal periods, and where no on-duty meal period agreements were signed), Plaintiff strongly believes he would prevail on this claim, if litigation continued. For mediation valuation purposes, and taking into account Defendant's defenses and denial of this claim, applying a 25% discount[4] to this claim would result in a reduced valuation number of $2,049,380.11. *Id.*, ¶ 17.

**Meal Breaks:**

**Harrison Case:** Plaintiff engaged an expert to analyze the 5% sample of teller time card data which analysis indicated facial meal break violations (late, short and/or missed) on 18% of shifts. Based on the facial violation rates, and to account for other violations not captured in the activity data, Plaintiff calculates a realistic maximum potential liability at a 30% violation rate: 925,314 workweeks * $15.68 average hourly rate * 1.2 violations/workweek = $17,410,707,  then reduced by the $1,396,231 in total premiums Bank of America paid to tellers during the class period, for a total of $16,014,476.  Markham Decl., ¶22.

Plaintiff recognizes the risks to liability and certification, as discussed further in section F below, and the substantial amount of premium payments the Bank paid globally in the three cases during the class period. Thus, Plaintiff discounts the maximum potential liability by 50% to account for the liability and certification risks, to a total of $8,007,238 realistic potential exposure on Plaintiff's meal break claim. *Id.*, ¶23.

**Kaffishahsavar Case**: Plaintiffs engaged an expert to analyze the data sample for the relationship

performing work for the Defendant at any given time on average during the class period. This represents the equivalent of a FTE count.  While there are 1,196 Operations Managers *total* in the settlement class, that total does not account for turnover or reflect the average number of positions at any given time on any given day. Thus, over the life of the case, there were approximately 700 Operations Managers for Defendant.  Saltzman Decl., ¶¶ 14-15.

[4] Because the Individual Settlement Payments for the Mendoza Class are calculated by multiplying the Base Workweeks by 1.66 (which is a higher value than the Harrison and Kaffishahsavar Classes), Plaintiff Mendoza has applied a smaller discount of 25% to each of his unpaid wages claim, meal and rest period claims, and failure to reimburse expenses claim, in comparison to the discounts in *Harrison* and *Kaffishahsavar*.

managers/personal bankers, which analysis indicated approximately 12% of shifts had a short or missed meal period (data analyzed did not capture "late" meal periods). Thus, based on the facial violation rates, and to account for other violations not captured in the activity data, Plaintiffs calculate a realistic maximum potential liability at a 25% violation rate: 834,686 workweeks * $20.35 blended average hourly rate for banker positions * 1.25 violations/workweek = $21,232,325 then reduced by the $7,120,513 in total premiums Bank of America paid to the banker group during the class period, for a total of $14,111,812. *Id.*, ¶24.

As discussed in the *Harrison* analysis above, Plaintiffs recognize the risks to liability and certification, as discussed further in section F below, and the substantial amount of premium payments the Bank paid globally in the three cases during the class period. Thus, Plaintiffs discount the maximum potential liability by 50% to account for the liability and certification risks, to a total of $7,055,906 realistic potential exposure on Plaintiffs' meal break claim. *Id.*, ¶25.

**Mendoza Case:** The meal period claim is based primarily upon the theory that Plaintiff and other Operations Managers were required to remain on the premises, at the contact centers, in order to perform various work duties, as discussed above. Thus, Plaintiff's and the Operations Managers' meal periods were essentially forced "on-duty" meal periods, without ever signing on-duty meal period agreements, and even though the nature of the work performed by Plaintiff and the Mendoza Class is not such that an "on-duty" meal period is appropriate. As such, Plaintiff contended that Defendant did not provide duty-free meal periods.

Defendant denied these claims entirely and argued that legally compliant meal periods were in fact provided to all employees. However, since Plaintiff and the Operations Managers were forced to remain on the premises during their meal periods and thus, take on-duty meal periods, pursuant to Defendant's company policies, Plaintiffs do not believe Defendant could have been compliant.

Plaintiff estimated the total value of this claim to equal $3,643,574.58, minus approximately $670,000 paid in meal period premium payments for roughly 700 FTEs, totaling $2,973,574.58. Saltzman Decl., ¶ 16. However, for settlement approval valuation purposes, and when taking into account both Defendant's legal and factual arguments, a more conservative and realistic valuation is to assign a 25% discount, or $2,230,180.94. *Id.*, ¶ 17.

/ / /

**Rest Breaks:**

**Harrison Case:** Rest breaks were not recorded, and Plaintiff's investigation revealed class members would periodically miss rest breaks when required to assist customers at the teller window due to the press of business. Plaintiff calculates the maximum realistic exposure for this claim at a 25% violation rate, or approximately 1 violation every workweek: 925,314 workweeks * $15.68 hourly rate * 1 violation/workweek = $14,508,923. Plaintiffs discount the maximum potential liability by 75% to account for the liability and certification risks, to a total of $3,627,231 realistic potential exposure on Plaintiff's rest break claim. The rest break claim is discounted more substantially than the meal break claim due to the lack of recording and difficultly Plaintiff anticipates to prove these violations on a class-wide basis. Markham Decl., ¶26. *See* discussion in Section F below.

**Kaffishahsavar Case:** As with *Harrison*, the rest breaks were not recorded, and Plaintiffs' investigation revealed class members would periodically miss rest breaks when required to assist customers and perform other duties due to the press of business. Plaintiffs calculate the maximum realistic exposure for this claim at a 20% violation rate, or approximately 1 violation per workweek: 834,686 workweeks * $20.35 blended average hourly rate * 1 violation/workweek = $16,985,860. As with *Harrison* and as discussed in Section F below, Plaintiffs discount the maximum potential liability by 75% to account for the liability and certification risks, to a total of $4,246,465 realistic potential exposure on Plaintiffs' rest break claim. *Id.*, ¶27.

**Mendoza Case:** Plaintiff's rest period claim was primarily based on the same theory as his meal period claim. Namely, Plaintiff contends he and other Operations Managers were required to remain on the premises and did not have relief for coverage to take duty-free rest periods because, as the Operations Managers, they had certain levels of authority that lower-ranking employees did not have, requiring them to stay on the premises to perform their work, even during their rest periods. Since rest periods are not captured via Defendant's timekeeping system, this liability would have needed to be established through class member testimony and damages would have been established via statistical sampling. Defendant has disputed this claim, to a larger extent than even the meal break violation claim. For valuation purposes, Plaintiff again estimated five violations per workweek, resulting in a valuation of $3,643,574.58. Saltzman Decl., ¶ 16. Because this claim is based on the same theory as Plaintiff's meal period claim, and is based on the same noncompliant policies and practices that Defendant had in place, Plaintiff applies a reasonable discount of

25% to the rest period claim, as well. This would yield a settlement valuation of $2,732,680.94. *Id.*, ¶ 17. Once again, if Defendant's witnesses were to be believed, the value of this claim could once again be zero.

**Unreimbursed Business Expenses:**

      **Kaffishahsavar Case:** The unreimbursed business expenses claim is premised on unreimbursed expenses related to calls with customers that would occur on bankers' personal cell phones and periodically incurred expenses when bankers were required to travel for out of town meetings. Plaintiffs assign minimal value as Plaintiffs' investigation indicated that the violations occurred sporadically, and further the claim faces challenges to quantify and prove when reimbursement was not sought (see section F below). Thus, Plaintiffs calculate average monthly unreimbursed business expenses of $16.00 per class member, or $4.00 per workweek, as follows: 834,686 workweeks times $4.00 = $3,338,744. Plaintiffs discount this potential liability by 50% to account for the liability and certification risks, for a total potential maximum liability of $1,669,372. Markham Decl., ¶28.

      **Mendoza Case:** This claim was based upon failure to reimburse expenses incurred by Plaintiff and other Operations Managers for the use of their personal cellular phones. Plaintiff contends that Defendant required employees to use their personal cellular phones for work. Defendant argued that it neither required the Operations Managers to use their personal cellular phones for work, nor was it aware of its employees using their personal cellular phones for work. Plaintiff assigned this claim a value of $348,267.50, assuming $50 per month for the use of personal cell phones, for approximately 700 full time employees at any given time. Saltzman Decl., ¶ 16. Allowing for normal trial risks and uncertainties, as well as Defendant's financial hardship, for settlement purposes, this claim should be discounted by 25%, for a value of $261,200.63. *Id.*, ¶ 17.

**Derivative Claims:**

      Plaintiffs' waiting time penalties claim (pursuant to Labor Code § 203) and inaccurate wage statements claim (pursuant to Labor Code § 226)[5] are primarily derivative in nature and would thus stand or fall with the claims discussed above and implicate the same risks in obtaining certification and proving liability discussed above. Markham Decl., ¶29.

---

[5] Plaintiff Mendoza's operative complaint does not include a claim for inaccurate wage statements. Saltzman Decl. ¶ 4.

**Harrison Case:** Plaintiff calculates wage statement penalties as a total of $18,547,500 based on the $50 per pay period for an initial violation for 5,884 class members; and $100 for each subsequent violation applicable to 182,533 pay periods. For waiting time penalties, Plaintiff calculated daily wages for approximately 9,664 former class members at $94.08 times 30 days, to amount to $ 27,275,673. Markham Decl., ¶30. For the reasons discussed in Section F below, including the operative case law which substantially limits the ability to prevail on derivative claims premised on meal and rest break violations, Plaintiff discounts the maximum value of the derivative claims by 50%. Thus, Plaintiff's total realistic potential liability on the *Harrison* derivative claims is: <u>$22,911,586.</u>  *Id.*

**Kaffishahsavar Case:** Plaintiffs calculate wage statement penalties as a total of $9,055,200 based on the $50 per pay period for an initial violation for 4,226 class members; and $100 for each subsequent violation applicable to 88,439 pay periods. For waiting time penalties, Plaintiffs calculate daily wages for approximately 2,500 former class members at $162.80 times 30 days, to amount to $12,210,000. Markham Decl., ¶31. As with *Harrison* and for the reasons discussed in Section F, including the operative case law which substantially limits the likelihood to prevail on derivative claims premised on meal and rest break violations, Plaintiffs discount the maximum value of the derivative claims by 50%. Thus, Plaintiffs' total realistic potential liability on the *Kaffishahsavar* derivative claims is: <u>$10,632,600</u>.  *Id.*

**Mendoza Case:** Plaintiff estimated that Defendant faced $2,510,880.00 in exposure for the FTEs for the alleged failure to pay all wages upon termination, calculated by multiplying thirty (30) days average wages by the total number of class-members who no longer work for Defendant. Saltzman Decl., ¶ 16. Plaintiff feels strongly that he can prevail on this claim, too, because it was Defendant's policies and practices that required Plaintiff and the Operations Managers to remain on the premises during their meal and rest periods, and perform work during what should have been off-duty time. The discount for this claim must be higher, since in addition to the normal litigation risks, Plaintiff would also need to prove the conduct alleged was "intentional", as it is subject to a "good faith dispute" defense. However, based on Defendant's requirement of Plaintiff and the Operations Managers being present at the branch during their breaks, it would be difficult to believe that Defendant was unaware of these violations. For purposes of settlement, this exposure, reduced by 50%, would equal <u>$1,255,440.00</u>.  *Id.*, ¶ 17.

In sum, the total maximum realistic potential liability in the three cases for Plaintiffs' direct claims is

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 3:19-CV-00316-LB

$56,511,860.52 and an additional $34,799,626.00 for Plaintiffs' derivative claims. Thus, the Settlement Amount of **$11,500,000** represents approximately <u>20% of Bank of America's maximum realistic potential liability for Plaintiffs' direct claims</u>, and approximately 13% (12.5%) of Defendant's maximum liability for all of Plaintiffs' claims. Saltzman Decl., ¶ 19; Markham Decl., ¶32. This is an excellent result, exceeding the range of settlements commonly approved by California district and state courts. *See* section E below.

<u>PAGA</u>: The Parties agreed that $115,000 of the Gross Settlement Amount will be allocated for payment under the PAGA. 75% of this amount ($86,250) will be paid to the LWDA, and 25% ($28,750) to class members. Markham Decl., ¶33. This amount is well within or exceeds the range of the PAGA penalties typically awarded as part of class action settlements. *See Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, at *19 (C.D. Cal. Feb. 16, 2017) ($10,000 as PAGA penalties found reasonable); *Franco v. Ruiz Food Products, Inc.*, 2012 WL 5941801, at *14 (E.D. Cal. Nov. 27, 2012) (approving PAGA penalties of $10,000 and noting that amount was in line with settlement approval of PAGA awards in other cases.); *Schiller v. David's Bridal, Inc.*, 2012 WL 2117001, at *14 (E.D. Cal. June 11, 2012) ($7,500 to LWDA reasonable).

Although the PAGA statute provides penalties at $100 per employee per pay period for the initial violation, and $200 for each employee per pay period for each subsequent violation, Defendant will contend that for Plaintiffs to recover for a "subsequent violation," an employer must have notice that it has violated the Labor Code. *Amaral v. Cintas Corp. No. 2,* 163 Cal.App.4th 1157, 1207–09 (2008); *see also Trang v. Turbine Engine Components Technologies Corp.,* 2012 WL 6618854 (C.D. Cal. Dec. 19, 2012) ("courts have held that employers are not subject to heightened penalties for subsequent violations unless and until a court or commissioner notifies the employer that it is in violation of the Labor Code"); *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc*., 2009 WL 2448430 (S.D. Cal. 2009) (finding that California law imposes the "subsequent violation penalty" only after an employer has been notified its conduct violates the Labor Code). Here, Bank of America was not cited for violations, and therefore, the $100 penalty for every pay period applies.

Further, here, Defendant would likely argue that under <u>Labor Code</u> § 558, penalties should be $50 per violation, because although Plaintiffs seek penalties through PAGA, PAGA provides the applicable civil penalty only if a particular <u>Labor Code</u> provision does not specify one. *Villacres v. ABM Indus. Inc.*, 189 Cal. App. 4th 562, 580 (2010). Here, meal and rest break premiums are not penalties, but wages, so section 226.7 premiums should not be treated as penalties, and the penalty under section 558 should be applied instead, as 558 penalties

apply to unpaid wages. *Culley v. Lincare, Inc.*, 236 F.Supp.3d 1184, 1195 (E.D. Cal. 2017). Failure to pay overtime is also subject to the $50 civil penalty provided in section 558, because section 558 applies to the penalties contained in the same chapter as section 510. *Villacres, supra*, 189 Cal. App. at 580.

The Settling Plaintiffs recognize that PAGA gives the Court wide latitude to reduce the amount of civil penalties "based on the facts and circumstances of a particular case" when "to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." California Labor Code § 2699(h).  In reducing PAGA penalties, courts have considered issues including whether the employees suffered actual injury from the violations, whether the defendant was aware of the violations, and the employer's willingness to fix the violation.

Further, it is unclear the Court would award such penalties as there is little guidance as to the standard for determining the amount of appropriate penalties under PAGA:

> [S]ection 2699, subdivision (e)(2) describes the conditions under which a trial court may exercise its discretion to *reduce* penalties. It does not specify guidelines for exercising discretion in general with regard to the amount of penalties, because the amount is fixed by statute….A court can only exercise its discretion *to award lesser penalties* based on the enumerated considerations.

*Amaral, supra*, 163 Cal. App. 4th at 1213 (internal quotations omitted); *see also Fleming v. Covidien Inc.*, 2011 WL 7563047, at *4 (C.D. Cal. Aug. 12, 2011).

Here, there are approximately 148,450 pay periods worked by class members during the PAGA Period, and the maximum amount of penalties Plaintiffs could recover at trial for Plaintiffs' direct claims is $44,535,000 (148,450 pay periods x $100 penalty x 3 for unpaid time, meal premiums and rest premiums (assuming at least one violation in *every* pay period)).[6]  Markham Decl., ¶34. As such, the PAGA Settlement Amount of $115,000 represents approximately 0.26% of the total potential PAGA penalties for Plaintiffs' direct claims. This result falls within the range of other approved PAGA settlements, as courts frequently approve PAGA awards between 0.2% to 2.2% of the total potential penalties. *Carrington v. Starbucks Corp.*, 30 Cal. App. 5th 504, 528 (2018) (awarding PAGA penalties of 0.2% of the maximum, or $5 per pay period); *Ruch v. AM Retail Grp., Inc.*, 2016 WL 5462451, at *2, 7 (N.D. Cal. Sept. 28, 2016) (settlement allocating $10,000 to PAGA penalties where potential value was over $5.2 million, resulting in 0.2 percent PAGA recovery approved); *Van Kempen v. Matheson Tri-Gas, Inc.*, 2017 WL 3670787, at *10 (N.D. Cal. Aug. 25, 2017) (granting final approval of $5,000

---

[6] The PAGA penalties exposure does not include penalties based upon Plaintiffs' derivative claims. *See* discussion in section F regarding risks of prevailing on derivative claims under the current law.

PAGA penalty from $370,000 settlement, or 1.4 percent); *Slavkov v. Fast Water Heater Partners I, LP*, 2017 WL 3834873, at *2 (N.D. Cal. July 25, 2017) (finding that "$7,500 PAGA payment is reasonable when measured against the total overall settlement [of $345,000] and the possible weaknesses in Plaintiffs' case," or 2.2 percent).

These PAGA penalties conform to the courts' reasoning that "[t]he remedy sought in a PAGA suit consists of civil penalties, not individual or class damages" [*Mendez v. Tween Brands, Inc.*, 2010 WL 2650571, at *4 (E.D. Cal. June 30, 2010)], and in PAGA "[u]nlike class actions, these civil penalties are not to compensate unnamed employees because the action is fundamentally a law enforcement action." *See Ochoa-Hernandez v. CJADERS Foods, Inc.*, 2010 WL 1340777, at *4 (N.D. Cal. Apr. 2, 2010).

### E.      The Settlement has no "Obvious Deficiencies" and Falls within the Approval Range

"[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).  Thus, when evaluating the amount offered in settlement, the Court should consider "the complete package taken as a whole," and the amount should "not be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* at 625-28.

Courts routinely approve class action settlements where the settlement amount is a lower percentage of the claimed amount of damages. In *Glass v. UBS Financial Services*, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007), the court approved a settlement of unpaid overtime wages where the settlement amount constituted only approximately 25 to 35% of the estimated actual loss to the class. *Id.* at *4; *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (finding recovery of 16.67% of the potential recovery adequate in light of the plaintiff's risks); *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 623-24 (N.D. Cal. 2014) (finding settlement amount of a wage and hour class action that equaled between 9% and 27% of the total potential liability to be fair, adequate and reasonable given the uncertainty of continued litigation). *Villegas v. J.P Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012); *Nichols v. Smithkline Beecham Corp.*, 2005 WL 950616, at *16 (E.D. Pa. April 22, 2005) (approving settlement that represented between 9.3% and 13.9% of the claimed damages). Simply put, "the fact that a proposed settlement may only amount to a fraction of the potential recovery does not mean that [it] should be disapproved." *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal.App.4th 1135, 1150 (2000), citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th

Cir. 1998).

Here, the Settlement represents <u>approximately 20%</u> of the realistic gross recovery for Plaintiffs' overtime, meal and rest break and unreimbursed business expenses claims, without any risks, costs, and uncertainty of prolonged litigation. Without accounting for the length of each class member's employment with Defendant, this will amount to an approximate recovery of $460.00 per class member, based on an estimated 25,000 putative class members, before normal case deductions. Saltzman Decl., ¶ 20; Markham Decl., ¶35. At an average blended hourly rate of $18.35, that equates to 10 hours of overtime pay and 10 premium payments. *Id*. This is an excellent result, when considering that Plaintiffs could face difficulties to establish liability and prevail at certification and trial.

### F.   Plaintiffs Face Certification and Liability Risks

Although Plaintiffs are confident in their position, they acknowledge they face certification and liability risks should the litigation continue. It is settled in California that "the employer's liability arises by adopting a uniform policy that violates the wage and hour laws." *Faulkinbury v. Boyd & Associates, Inc.,* 216 Cal.App.4th 220, 235 (2013). However, here, Bank of America will likely argue its timekeeping and meal and rest break policies appear facially valid.

First, regarding Plaintiffs' off-the-clock/unpaid time claim, Plaintiffs would argue, based on *Williams v. Superior Court*, 221 Cal.App.4th 1353 (2013) that an off the clock/unpaid time class can be certified when an employer has a *de facto* practice of not paying employees for all hours worked, even if the employer's official written policy forbids off the clock work. *Id*. at 1365, 1369. However, Bank of America would likely distinguish *Williams* on the basis that in *Williams* the employer's policy specifically excluded from payment employee hours that were indisputably worked every day, whereas here, Bank of America's overtime and timekeeping policy advised class members that they would be paid for all hours worked. Markham Decl., ¶36. Plaintiffs would also argue, that as confirmed by the California Supreme Court in *Troester v. Starbucks Corp.*, 5 Cal. 5th 829 (2018), there is no *de minimis* doctrine in California, and employers must compensate employees for the minutes routinely worked off–the–clock. *Id*. at 848.  However, Defendant would likely distinguish *Starbucks* by arguing that here, in contrast to the facts at issue in *Starbucks*, Plaintiffs and class members were paid overtime for time worked outside of their scheduled shifts as evidenced by overtime payments in Plaintiffs' and other class members' payroll records. *Id.,* ¶37. Further, Plaintiffs would likely face challenges in relying on activity data to

1    prove off-the-clock violations, based on the results of analysis of the sampling as indicated in section D above.

2    Second, regarding Plaintiffs' meal and rest break claims, Plaintiffs would argue, based on *Brinker*, that

3    Bank of America undermined its formal policies "by pressuring employees to perform their duties in ways that

4    omit breaks." *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1040 (2012), Bank of America

5    would likely respond that some Class Members might have been able to take uninterrupted meal (and rest) breaks,

6    while some might not have been able to (on different occasions and for different reasons). This could create

7    individualized issues defeating commonality and predominance, and manageability.  In further support of its

8    position, Bank of America would likely argue that since January 1, 2017, it has had a system for paying meal

9    break premiums when employees recorded time that indicated they did not take a compliant meal period and the

10   only owed penalties would be where employees recorded a compliant meal period and that time entry was not

11   accurate. Markham Decl., ¶38. Lastly, even if the rest break class were certified, damages and penalties

12   calculations could present complicated issues as employees did not have to clock out to take rest breaks, or

13   otherwise record them. *Id.*

14   Third, regarding Plaintiff's unreimbursed business expenses claim, Defendant would likely argue that

15   class members did not work in a position which required them to regularly incur business expenses, which

16   Plaintiffs acknowledge could result in hurdles in quantifying and proving commonality for certification purposes.

17   *Id.*, ¶39. Further, Defendant would likely assert that to the extent Plaintiffs and class members incurred expenses

18   on their personal cell phones but did not submit business expense reimbursement forms, Defendant was not on

19   sufficient notice of the expenses incurred. *See e.g.*, *Hammit v. Lumber Liquidators*, 19 F. Supp. 3d 989, 1001

20   (S.D. Cal. 2014) (granting summary judgment when employee failed to request reimbursement).

21   Lastly, Plaintiffs' success on their derivative wage statement claims is highly uncertain and contingent

22   on the success of Plaintiffs' primary claims. Under *Maldonado v. Epsilon Plastics, Inc.*, 22 Cal.App.5th 1308

23   (2018) wage statement penalties are not warranted when a pay stub correctly shows the amounts *actually paid* to

24   the employee. *Id.* at 1337. Further, *Maldonado* holds that meal and rest break premiums cannot form the basis

25   of the wage statement and waiting penalties claim. *Id.* at 1336-37. Similarly, *Naranjo v. Spectrum*, 40

26   Cal.App.5th 444 (2019) holds that a plaintiff cannot recover waiting time penalties for unpaid meal and rest break

27   premiums, which would substantially lower Plaintiffs' recovery for Labor Code §§ 201-203 and § 226 claims.

28   *Naranjo, supra*, 40 Cal.App.5th. at 270-71; *see also Betancourt v. OS Rest. Servs., LLC*, 49 Cal. App. 5th 240,

248 (2020), *reh'g denied* (May 18, 2020), *review filed* (June 23, 2020) (Agreeing with "*Naranjo* that a plaintiff is not entitled to recover penalties for waiting time and wage statement violations based on claims of nonprovision of rest or meal periods, and likewise cannot obtain attorney fees based on those claims.") In *Harrison*, Bank of America moved for summary judgment on these grounds and determination on the motion was pending at the time settlement was reached. Quintilone Dec. ¶ 8; Markham Decl., ¶40.

The court should therefore compare the uncertainties of the prolonged litigation with the immediate benefits that the settlement provides to the Class Members.  Here, the Settlement amount of **$11,500,000** was reached with the aid of an experienced mediator. Saltzman Decl., ¶¶ 9-10, 12. When considering the probability of lengthy litigation in the absence of a settlement, the risk that Plaintiffs and the Class Members might not have been able to succeed at trial, and the risk that a jury could award damages less than **$11,500,000**, the settlement amount is reasonable.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458; *Sandoval v. Tharaldson Employee Management, Inc.*, 2010 WL 2486346, at *7 (C.D. Cal. June 5, 2010).

## IV.   THE SETTLEMENT EXCEEDS THE STANDARDS FOR PRELIMINARY APPROVAL

The district court has broad discretion to approve Rule 23 settlements and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1036 (9th Cir. 1998).  In determining whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned." *In re Heritage Bond Litig.*, 2005 WL 1594403 (C.D. Cal. June 10, 2005) (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Court approval involves a two-step process where the court first determines whether preliminary approval is warranted, so that notice of the same can be disseminated, and then after notice is given to the class, the Court reviews the settlement once again to determine whether final approval is warranted. *Manual of Complex Litigation*, 4th, § 21.632 (2004); *Hanlon*, 150 F.3d at 1019. At the preliminary approval stage, the Court need only "determine whether the proposed settlement is within the range of possible approval." *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1063 (C.D. Cal. 2010).

At the outset, there is a "strong initial presumption that the compromise is fair and reasonable." *Hanlon*, 150 F.3d at 1019. A class action settlement is presumed to be fair when: (1) the settlement is reached through arm's length agreement; (2) investigation and discovery are sufficient to allow counsel and the court to act

intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small. Newberg & Conte, *Newberg On Class Actions* § 11.41 (3d ed. 1992). It is clear as set forth hereafter that this settlement satisfies the *Hanlon* "presumption" factors.

**Arm's Length Negotiations:**  As discussed above, the settlement was definitely reached through arm's length negotiations, having only reached a resolution following a full day and evening of mediation before esteemed wage and hour class action mediator David Rotman, Esq., and then several weeks of ongoing discussions while the Parties were considering the "mediator's proposal" issued by Mr. Rotman.  Ultimately, the Plaintiffs in these banking center cases, and the Bank, agreed upon the final terms of a full and complete settlement, as set forth in the Settlement Agreement.

**Sufficient Investigation and Discovery:**  As also discussed above, the investigation and discovery in the cases, along with the privileged informal mediation related discovery provided by the defendant, enabled Plaintiffs' counsel, already very familiar with all the applicable laws, to be very well informed so as to properly evaluate the claims, the likelihood of certification is the cases did not settle, and the strengths of the claims if they had to be brought to trial.  As a result of all of this information, combined with counsels' many years of class action experience, including in cases of a similar nature, Plaintiffs' counsel was more than prepared to intelligently assess both the strengths and weaknesses of the case, in order to negotiate a fair and reasonable settlement.

**Experienced Counsel:**  As set forth in the declarations of the various lead Plaintiffs' Class Counsel in the three cases, the level of expertise and past success they bring to the cases is quite high, certainly amongst the strongest class counsel in the state.  Mr. Saltzman and the entire Marlin & Saltzman firm are extremely experienced in wage and hour class action litigation. Saltzman Decl., ¶¶ 28-35; Avakian Decl., ¶¶ 3-8. Marlin & Saltzman has been blessed to have achieved some of the largest recoveries in this field of law over the last 20 years and it continues to do so at this time. Saltzman Decl., ¶¶ 28-35. The details of the settlements and judgments (yes, judgments on trials) are set forth in the Saltzman declaration, and the total recoveries by he and the firm are now quickly approaching One Billion Dollars. *Id*.

The attorneys at the Markham Law Firm have extensive experience in class action litigation, including wage–and–hour, consumer, antitrust, and securities litigation. The Markham Law Firm has been lead or co–lead class counsel in hundreds of class action cases in federal and state courts in California, and throughout the

United States, and in over thirty reported and widely–cited appellate cases. Markham Decl., ¶¶41-49. The Markham Law Firm has conducted trials in over twenty cases, both bench and jury, including class action trials. The Markham Law Firm has obtained many large class action settlements which have benefitted consumers and employees, which are listed in the attached declaration of David R. Markham.

The attorneys at Quintilone & Associates have extensive experience in class action litigation, specifying in wage and hour cases. Quintilone & Associates has been appointed lead class counsel or co-class counsel in over 30 cases in both California and United States District Courts, and has negotiated many wage and hour class action settlements, including many involving the issues presented here. A list of Quintilone & Associates' notable class action cases can be found in the attached declaration of Richard E. Quintilone II, Esq. (Quintilone Dec. ¶ 4).

Accordingly, it is clear that the settlement before the Court merits the strong initial presumption that the compromise is fair and reasonable, as the first three issues are well established.

The number of objectors, if any, is of course premature to determine at this time, as notice has not yet been disseminated to the class, so this issue will necessarily be addressed at the time of final approval.

The Court's ultimate fairness determination at the final fairness hearing will include balancing several factors, including some or all the following, which will be addressed in the motion for final approval:

(1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and [likely] duration of further litigation; (3) the risk of maintaining class [action status throughout the trial]; (4) the amount of the settlement; (5) investigation and discovery [completed]; (6) the experience and views of counsel; and (7) the reaction of class members.

*In re Skilled Healthcare Grp., Inc. Sec. Litig.*, No. CV 09-5416 DOC (RZx), 2011 WL 280991, at *2 (C.D. Cal. Jan. 26, 2011) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003)).  It is evident that this settlement will meet these standards, many of which are set forth above in the discussion of the *Hanlon* factors.

## V.    NATURE AND METHOD OF CLASS NOTICE

"For any class certified under Rule 23(b)(3), including those certified for settlement purposes, the court must direct to settlement class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Federal Rules of Civil Procedure 23(c)(2)(B). Here, the Parties have agreed upon a Notice which will be mailed to all last known

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 3:19-CV-00316-LB

addresses found in the Defendant's records, updated as necessary by the Settlement Administrator. This is the most efficient and effective method for notifying putative class members, thus satisfying the "best practicable" notice standard.

As for the content of the notice, the proposed Notice, attached to the Stipulation as Exhibit B, satisfies the criteria in Rule 23(c)(2). It informs putative class members of (i) the nature of the action(s); (ii) the definition of the settlement class certified; (iii) the class claims, issues, or defenses involved in the case and being released herein, and the settlement class period; (iv) that a class member may enter an appearance through counsel if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members under Rule 23(c)(3). It also informs them of their right to object, and if they choose to do so, how that must be done.  Plaintiffs ask that the Proposed Notice be approved.

## VI.   CLAIMS ADMINISTRATION

The Parties have agreed to the appointment of Simpluris, Inc., a highly experienced wage and hour class administration company, as the Settlement Administrator. Saltzman Decl. ¶ 24; Markham Decl. ¶50. Before deciding on Simpluris, Inc., Plaintiffs' counsel obtained bids from two other potential third-party administrators, ILYM Group, Inc. and CPT Group, Inc., but ultimately agreed to use the services of Simpluris, Inc., as they gave the lowest bid for services, which ultimately results in a higher Net Settlement Fund for the Settlement Class. *Id.*

## VII.   ATTORNEYS' FEES AND COSTS

The Settlement Agreement allows Class Counsel to apply for an award of fees to be paid from the total settlement established for the benefit of the settlement class, in an amount not to exceed 30% of the total fund, as well as reimbursement of costs and expenses incurred, which in this case will not exceed $100,000.00. Courts in California wage and hour cases, where the common fund is under $10 million, tend to award attorneys' fees in the 30% - 40% range. *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491-92 (E.D. Cal. 2010) (citing to five wage and hour class actions where courts approved fee awards ranging from 30 to 33%). The trial court has discretion to award attorneys' fees based on either the lodestar/multiplier calculation or the percentage-of-recovery method. *Laffitte v. Robert Half International Inc.*, 1 Cal.5th 480, 503 (2016). For the final approval motion, Class Counsel intends to brief the fee application using both methodologies, as cross checks. Defendant

agrees not to oppose or object to the application for attorneys' fees and costs in the amounts described above. Settlement Agreement, ¶ 26.

## VIII.   SERVICE AWARD FOR PLAINTIFFS

The Settlement Agreement contemplates that Plaintiffs will apply for a service award to be paid from the gross settlement fund in the amount of $10,000.00 each (for a total of $40,000.00), and Defendant Bank of America has agreed not to object to a request of up to that amount. Settlement Agreement, ¶ 27. The request for this award is also disclosed in the proposed Notice. (Saltzman Decl. Ex. 1 [Ex. B]). Each of the Plaintiffs has stepped up to seek justice on behalf of the entire Class; has worked with counsel to assist in the case preparation and presentation; and assisted with the mediation and settlement negotiations. They have therefore fully satisfied their duties to serve as fiduciaries for the Class.

In addition, as class representatives in this technology-driven era, they have voluntarily subjected their good names to the negative impacts of the internet, such that all future prospective employers can easily determine that they have been class representatives in a suit against one of their previous employers. No other class member receiving a benefit hereunder will ever suffer that same level of future scrutiny.

While Plaintiffs will file their motion for these awards along with Class Counsel's application for fees and costs, to be determined by this Court at final approval, this brief summary description of the justification of the service awards requested is submitted so that the awards sought may be included in the Notice to be sent to all putative class members.

## IX.   CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE

As set forth above in the Introduction to this motion, the Parties seek preliminary certification of the following Class.  The Class consists of Defendant's current and former non-exempt employees that fall within at least one of the following subclasses:

     a.   Employees working or who worked in the State of California for Defendant as a "Teller" (meaning Job Codes RT600 – FC Client Service Rep and RT601 – Market Client Service Repo) on or after October 26, 2014, through the date of preliminary approval of the settlement by the Court; and/or

     b.   Employees working or who worked in the State of California for Defendant as a "Financial Center Operations Manager" or a "Financial Center Assistant Manager" (meaning Job Codes

RM019 – Assistant Manager-FCC and RM038 – Financial Center Assistant Manager) on or after March 25, 2015, through the date of preliminary approval of the settlement by the Court; and/or

     c.    Employees working or who worked in the State of California for Defendant as a Personal Banker (Job Code RS600), Senior Personal Banker (Job Code RS601), Relationship Manager (Job Code BQ055), Relationship Manager and Lending Specialist (Job Code BQ22), Sales and Service Specialist (Job Code RS860), Relationship Banker (Job Code RS861), or a Relationship Banker – Hybrid (Job Code RS862) on or after March 27, 2016, through the date of preliminary approval of the settlement by the Court.

The Class expressly excludes therefrom any individuals who, as of the date of final approval of the Class Settlement, have filed a pending, separate lawsuit, individually and/or as a putative class or representative action, asserting the same claims to those alleged in the Lawsuits, including but not limited to the certified claims in *Frausto v. Bank of America, N.A.*, Case No. 3:18-cv-01983-LB and *Suarez v. Bank of America, N.A.*, Case No. 3:18-cv-01202-LB, as set forth in Dkt. #128 of Case No. 3:18-cv-01983-LB.  The Class also excludes any former employee of Defendant who has previously released such claims.  With respect to any current employee who has previously released such claims, any time period covered by each such employee's release agreement shall be excluded from the calculation of any settlement sum payable under this Agreement.

**A.**    **Federal Rule of Civil Procedure 23(a) Requirements Are Met for the Settlement Class**

When seeking certification of a class pursuant to Rule 23, plaintiffs have the burden of showing the four requirements of Rule 23(a) as well as one of the requirements of Rule 23(b).   The four requirements of Rule 23(a) are typically referred to as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).   In this case, the Parties agree to provisional certification of the settlement Class under Rule 23(b)(3), which has the added requirement of "predominance." *Id*.

**1.**    **Numerosity**

Rule 23(a) (1) is typically referred to as "numerosity" in that it requires a class that is "so numerous that joinder of all members is impracticable." The term "impracticable" does not mean "impossible," and only refers to "the difficulty or inconvenience of joining all members of the class." *Advertising Specialty Nat'l Assoc. v. Fed'l Trade Comm'n.*, 238 F.2d 108, 119 (1st Cir. 1956).  Here, with thousands of putative

class members, the numerosity factor is easily met.

/ / /

### 2.   Commonality

Rule 23(a)**Error! Bookmark not defined.**(2) requires that "there are questions of law or fact common to the class." The Ninth Circuit has held that commonality exists "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. Cal. 2001).

Here, Plaintiffs have alleged various wage and hour violations that are common within each of the three categories of employees involved in the now proposed consolidated complaint.  These include the banking center Tellers, Personal Bankers, and the Operations Managers.  Based on the allegations in the proposed consolidated complaint, drawn directly from the three previous stand-alone actions, the following list of common questions of law and fact are presented as articulated in the operative Complaint.

- Whether Defendant's policy and/or practice forced Plaintiffs and the class to work off the clock;
- Whether Defendant's failed to pay Plaintiffs and the Class for pre-shift and post-shift work;
- Whether Defendant violated Labor Code in failing to pay Plaintiffs and the Class minimum/regular and overtime wages for all hours worked;
- Whether Defendant had a policy or practice of not paying meal or rest period premium wages;
- Whether Defendant violated Labor Code § 226.7 and/or § 512 and engaged in a pattern or practice of failing to provide timely, off–duty thirty (30) minute meal periods to Plaintiffs and members of the class
- Whether Defendant engaged in a pattern or practice of impeding Plaintiffs and the members of the class from taking statutory off–duty thirty (30) minute meal periods on a timely basis;
- Whether Defendant engaged in a pattern or practice of failing to properly compensate Plaintiffs and the members of the class for missed, untimely or on–duty meal periods and rest periods as required by California law;
- Whether Defendant violated the applicable California Industrial Welfare Commission ("IWC") Order by failing to provide Plaintiffs and the members of the class with timely off–duty thirty (30) minute meal periods;
- Whether Defendant engaged in unfair practices and violated California Business and Professions Code

31

§ 17200 by failing to provide Plaintiffs and the members of the class with their statutory off–duty meal and rest periods on a timely basis;

- Whether Defendant engaged in unfair practices and violated California Business and Professions Code § 17200 by failing to pay Plaintiffs and the members of the class for all time worked;

- Whether Defendant maintained accurate time records of off–duty thirty (30) minute meal breaks taken by Plaintiffs and members of the class in accordance with the applicable IWC Wage Order;

- Whether Defendant violated Labor Code § 226 (a) by issuing inaccurate itemized wage statements to Plaintiffs and members of the class that failed to include payments for missed, untimely, and/or on–duty meal periods among wages earned throughout the Class period;

- Whether Defendant violated Labor Code § 226 (a) by issuing inaccurate itemized wage statements to Plaintiffs and members of the class that failed to include payment for all hours worked;

- Whether Defendant violated Labor Code § 226 (a) by issuing inaccurate itemized wage statements to Plaintiffs and members of the class that failed to accurately state the total hours worked, to the detriment of Plaintiffs and the class;

- Whether Defendant failed to compensate, and therefore violated Labor Code § 226.7 and the applicable Wage Order by failing to provide ten (10) minute, uninterrupted rest periods as contemplated by California law for work periods in excess of three and one–half (3 ½) hours;

- Whether Defendant engaged in a pattern or practice of failing to properly compensate Plaintiffs and the members of the class for failing to provide ten (10) minute, uninterrupted rest periods as contemplated by California law for work periods in excess of three and one–half (3 ½) hours;

- Whether Defendant violated Labor Code § 1197 due to failure to compensate Plaintiffs and members of the class for those acts Defendant required Plaintiffs and members of the class to perform for the benefit of Defendant;

- Whether Defendant violated Labor Code § 2802 due to failure to reimburse Plaintiffs and members of the class for those expenses Defendant required Plaintiffs and members of the class to perform for the benefit of Defendant;

- Whether Defendant violated Labor Code § 201-203 by failing to pay all wages due upon termination to all Class members who were terminated or voluntarily quit.

These common issues easily satisfy Rule 23(a) (2)'s requirements.

### 3.       Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  This requirement is "permissive" and requires only that the representative's claims are reasonably related to those of the absent class members.  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. Cal. 2010). Here typicality is met because the claims of all the putative class members are based on the same legal and factual claims as those of the Plaintiffs from each of the respective job duties in the banking centers.

### 4.       The Adequacy Requirements Are Satisfied

The proposed class representatives, Andrea Harrison, Miguel Mendoza, and Kiarash Kaffishahsavar, Kimberly Jaco and class counsel, Marlin & Saltzman LLP, The Markham Law Firm, Quintilone & Associates, and United Employees Law Group all represent that they have and will continue to "fairly and adequately protect the interests of the class." Federal Rules of Civil Procedure 23(a) (4). The adequacy requirement has two prongs, the first being "that the representative party's attorney be qualified, experienced, and generally able to conduct the litigation." *In re Surebeam Corp. Secs. Litig.*, No. 03 CV 1721JM9POR), 2004 WL 5159061, at *5 (S.D. Cal. Jan. 5, 2004).  Here Plaintiffs' chosen counsel, as previously discussed hereinabove, have litigated and successfully resolved numerous wage and hour class actions, by way of settlement, arbitration and trial. (*See* Saltzman Decl. ¶¶ 28-35; Markham Decl., ¶¶41-49; Quintilone Decl., ¶ 4).

The second prong of the adequacy test is "that the suit not be collusive and the representative plaintiff's interests not be antagonistic to those of the remainder of the class." *In re Surebeam Corp. Secs. Litig.*, 2004 WL 5159061, at *1-2.  Plaintiffs have litigated these cases in good faith and the interests of Plaintiffs are fully aligned with those of the putative class members, because both share a common interest in challenging the alleged violations of wage and hour laws as demonstrated by the practices, policies, and procedures of the Defendant, Bank of America.

### B.       The Federal Rule of Civil Procedure 23(b) Standards Are Satisfied

### 1.       Common Issues Predominate

In addition to the Rule 23(a) requirements, a district court must also find that common issues of

---

33

law or fact "predominate over any questions affecting only individual members." <u>Federal Rules of Civil Procedure</u> 23(b) (3). The Claims in this case are sufficiently cohesive to warrant adjudication by representation. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436 (2013). Furthermore, because the "predominance" factor concerns liability, any variation in damages is plainly insufficient to defeat class certification. *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013).

Plaintiffs assert that the alleged violations set forth in the proposed consolidated complaint are representative of all of the employees in the three job titles alleged in the action(s). Wage and hour class actions, in particular, are commonly found to meet the predominance requirement, since the hourly employees of large employers are so commonly subject to common policies and practices, lending to such actions a high level of finding common predominant issues. The common issues, the predominant issues in wage and hour class action litigation, are set forth at length above.

### 2. The Class Action Device Is Superior

The class action proposed herein is "superior to other available methods for the fair and efficient adjudication of the controversy." <u>Federal Rules of Civil Procedure</u> 23(b) (3). Provisional certification of the cases for settlement purposes will enable the Class members' claims to be fairly, adequately, and efficiently resolved to a degree that no other mechanism or forum would provide. As in *Hanlon*, the alternative methods of resolution would require that each employee file his or her own individual claims, a daunting task against the much stronger defendant involved, and one not likely to be pursued by many of them. *Hanlon*, 150 F.3d at 1019-20. Thus, the class is the most efficient method to resolve the claims.

## X. NO MANAGEABILITY ISSUES PRECLUDE CERTIFICATION

Finally, no issues of manageability preclude certification of a settlement Class. A court faced with a request for a settlement-only class like this <u>need not</u> inquire whether the case would present problems of trial management, even though the other requirements under Rule 23 must still be satisfied. See, e.g., *Lazarin v. Pro Unlimited, Inc.*, No. C11-03609 HRL, 2013 WL 3541217, at *5 (N.D. Cal. July 11, 2013). In any event, Plaintiffs believe the proposed plan of distribution and settlement process are both efficient and manageable.

## XI. PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS "CLASS COUNSEL"

Rule 23(g) requires that courts consider the following four factors when appointing settlement

class counsel: (1) whether counsel has investigated the class claims; (2) whether counsel is experienced in handling class actions and complex litigation; (3) whether counsel is knowledgeable regarding the applicable law; and (4) whether counsel will commit adequate resources to representing the class.  See *Grant v. Capital Mgmt. Servs., L.P.*, No. 10-cv-2471-WQH (BGS), 2013 WL 6499698, at *2-3 (S.D. Cal. Dec. 11, 2013).

Here, the proposed class counsel are all highly experienced and knowledgeable regarding complex federal and state wage and hour class actions like this one.  (*See* Saltzman Decl. ¶¶ 28-35; Markham Decl., ¶¶41-49; Quintilone Decl., ¶¶ 3-4).  Indeed, Plaintiffs' counsel collectively have successfully resolved in excess of hundreds of wage and hour class actions, via settlements and trial/arbitration.  In addition, Plaintiffs' counsel herein have fully investigated the allegations and claims presented, and have collectively fully committed their resources to represent the Class Members herein, and will continue to do so.

## XII.   CONCLUSION

The Parties have reached a favorable settlement of complex issues, in a fully arm's-length process of negotiations. Plaintiffs respectfully request that the Court order the conditional certification of the Action for settlement purposes as requested herein, grant preliminary approval of the proposed settlement to permit the notice phase to proceed, and enter the proposed Order Granting Preliminary Approval, attached as **Exhibit 2** to the Saltzman Decl.  The Parties also request that the Court set a Final Approval Hearing for a date approximately 150 days following the issuance of the Order Granting Preliminary Approval.  This time period will allow for the Defendant to provide the class list and requisite information to the Settlement Administrator for Notice purposes, and allow sufficient time for the Class Members to make their elections as to the Settlement, and for the final approval motions to be filed and heard by this Court.

DATED: April 22, 2021                    **MARLIN & SALTZMAN, LLP**

By:   */s/ Tatiana G. Avakian*
      Stanley D. Saltzman, Esq.
      Tatiana G. Avakian, Esq.
*Attorneys for Plaintiff Miguel Mendoza and the putative Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Tatiana G. Avakian, an attorney, certify that I caused the foregoing document to be served on all counsel of record in this action via the Court's CM/ECF system on April 22, 2021.


By:   */s/ Tatiana G. Avakian*
       Tatiana G. Avakian, Esq.
       *Attorney for Plaintiff Miguel Mendoza and the*
       *putative Class*

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 3:19-CV-00316-LB